**SO ORDERED.**

**SIGNED this 21st day of December, 2017.**



_____
Robert E. Nugent
United States Bankruptcy Judge
_____

**PUBLISHED**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANASAS**

| | |
|---|---|
| IN RE: <br><br> **STEPHEN GREGORY GRILLOT** <br><br><br><br> **Debtor.** | Case No. 16-11262 <br> Chapter 7 |

**MEMORANDUM OPINION**

A guaranty of a business debt is generally not a consumer debt. In this chapter 7 case, the creditor contends that the debtor agreed to guarantee his estranged wife's company's industrial revenue bond obligations in connection with a commercial development project in exchange for her waiver of spousal support. Because spousal support is usually a consumer debt for Bankruptcy Code purposes, the guaranty holder asserts the debtor incurred the guaranty debt for "consumer purposes" and that it should count as such in determining whether the debtor's chapter 7 petition

1

constitutes abuse under § 707(b)(1). If the Court determines it is a consumer debt under 11 U.S.C. § 101(8), the debtor would be subject to the means test found in § 707(b)(2) or the totality of the circumstances test found in § 707(b)(3), possibly resulting in this case being dismissed.[1]

Shortly after debtor's chapter 7 filing, the creditor Security State Bank of Kansas City ("Bank") moved to dismiss the case for abuse under § 707(b)(1).[2] The debtor moved for summary judgment contending that § 707(b)(1) didn't apply because debtor's debts, including the guaranty, were not primarily consumer debts.[3] The Court denied the motion because of open factual issues that precluded a summary determination on whether the guaranty debt was incurred "primarily for a personal, family, or household purpose."[4] The Court has now conducted a trial on the issue and concludes that the debtor's guaranty is a non-consumer debt and he is not subject to § 707(b)(1).[5]

Findings of Fact[6]

---

[1] *See* 11 U.S.C. § 707(b)(2) (circumstances under which the filing is presumed to be an abuse) and (b)(3) (cases that are determined to be abusive under the totality of the circumstances).

[2] Doc. 17. The Bank alternatively moved for conversion of debtor's case to chapter 11 under 11 U.S.C. § 706(b), but abandoned that motion without prejudice in the final pretrial order. *See* Doc. 19 and 49, at p. 2, ¶ 3.

[3] Doc. 51, 52.

[4] Doc. 64, Order Denying Summary Judgment at p. 2. *See* 11 U.S.C. § 101(8).

[5] Dr. Stephen Grillot appeared in person and by his attorney Jeffrey L. Carmichael. Security Bank of Kansas City, as Trustee of Industrial Revenue Bonds on the Concierge Surgical Recovery Center project, appeared by Eric W. Lomas. The chapter 7 trustee Darcy D. Williamson also appeared and supports Debtor's position.

[6] The factual findings are taken from the Court's summary judgment order, as supplemented and developed by evidence presented at trial. *See* Doc. 64 at n. 4; Fed. R. Civ. P. 56(g).

Debtor Steven Grillot filed this chapter 7 case on July 8, 2016 to deal with several years of unpaid income taxes and shortly after the Bank obtained a state court judgment against Stephen on a guaranty he gave on his estranged wife's company's commercial debt. In his petition Stephen stated that his debts were primarily business debts and not primarily consumer debts.[7] He did not complete Official Form 122A–1 to determine whether the means test applies, claiming to be exempt from a presumption of abuse.[8]

Stephen is a 64-year-old emergency care staff physician who is a salaried employee at a hospital in El Dorado, Kansas. He works for another medical center and holds a third job as a county EMS Director. He receives salary compensation for these services. Prior to 2013, Stephen had been employed by hospitals as an independent contractor. He underpaid his income taxes during that time and was attempting to pay those back taxes through asset sales and his income. At the petition date, Stephen owed $445,911 in back taxes, $246,936 of which is non-dischargeable priority taxes. The Internal Revenue Service's tax claim comprises roughly 34% of Stephen's $1.3 million in debt.[9] The Bank holds a judgment against Stephen on the Guaranty that exceeds $642,000 and its claim comprises approximately 49% of Stephen's debts. His debts from his schedules are listed below:

| Creditor | Amount |
|---|---|
| First Premier Bank | 88.06 |

---

[7] Doc. 1, p. 6, line 16.
[8] Doc. 1, p. 53 – Official Form 122A – 1Supp.
[9] Doc. 1, p. 36 – Official Form 106Sum, Total liabilities of $1,305.494.94.

3

| | |
|---|---:|
| Allied Home Mortgage Co. | 175,000.00 |
| Internal Revenue Service (Schedule D and E) | 445,911.00 |
| Kansas Dept. of Revenue | 19,378.38 |
| Kanza Bank (in rem only) | 23,000.00 |
| Security Bank | <u>642,117.50</u> |
| Total | $1,305,494.94 |

In 2008, Stephen and his wife, Terrie Mayta Grillot, organized Tierra Verde Development, LLC ("TVD"). Stephen owned at least a 10% equity interest in TVD.[10] Terrie also owned an equity interest in TVD and was the managing member. Stephen recruited numerous physicians in the community to invest in TVD.[11] They established TVD to acquire bare ground from the city of Bel Aire, Kansas (a suburb of Wichita) for a mixed-use development that would include a surgical recovery center. TVD acquired the land in early 2009.[12] At the same time, and as part of the development, Terrie organized another LLC named Concierge Surgical Recovery Center, LLC (CSRC) to develop a surgery recovery center. Stephen had no equity interest in CSRC, but assisted Terrie by again using his connections to other physicians in the community to obtain investments in CSRC and to help get the CSRC

---

[10] According to the Grillots' Settlement Agreement in their divorce case, Stephen and Terrie each owned 20% of the Class B shares of TVD. Terrie also held options on some of the TVD land. Doc. 61, Ex. 3, pp. 34-5. Stephen retained his interest in TVD under the Settlement Agreement. The correct percentage of Stephen's interest in TVD is not material to the issue presented here.
[11] Trial Ex. M, Investors' List.
[12] Trial Ex. I.

4

project going.[13] Several local physicians invested in the project. Terrie is the chief executive officer of CSRC.[14]

Stephen and Terrie's marriage had been turbulent long before 2009 when the couple separated. Stephen voluntarily provided support to Terrie of $8,500-$10,000 per month during their separation. Stephen testified that the high maintenance payments contributed to his failure to pay his current income tax liabilities. Stephen petitioned for divorce on January 11, 2011, but didn't aggressively prosecute the divorce case at that time because he was waiting for Terrie to get the CSRC project "off the ground."[15] After Stephen filed, Terrie sought and received an award of temporary spousal maintenance which Stephen paid throughout the pendency of the divorce.[16] Stephen also paid Terrie's house and car payments, insurance, utilities, and other living expenses. Not until July of 2014 did Stephen and Terrie reach a Settlement Agreement to finalize their divorce.[17] According to Stephen, spousal support was supposed to cease once Terrie obtained the business loan for CSRC and got the development up and running. Even so, each of Terrie's offers to resolve the divorce between 2011 and July of 2014 demanded the payment of continuing spousal

---

[13] Trial Ex. P.
[14] *See* Trial Ex. 8.
[15] Trial Ex. 15.
[16] Trial Ex. W shows that Stephen was mostly paying $5,000 per month support to Terrie through the Kansas Payment Center between February of 2011 and September of 2012. That same exhibit reflects that Stephen was paying $2,500 monthly spousal maintenance during 2013. Stephen reported paying Terrie over $47,000 of alimony on his 2013 income tax return. *See* Trial Ex. T-103.
[17] Trial Ex. 19 – Settlement Agreement; Trial Ex. 20 – Journal Entry of Judgment and Decree of Divorce.

5

support. In the July agreement, Stephen agreed to pay alimony through the end of 2014. More on that follows.

All the while, during the Grillots' separation and divorce case, Terrie proceeded with the CSRC project. TVD conveyed land to CSRC for the development of the surgical recovery center on August 20, 2010.[18] CSRC paid TVD $335,000.[19] As an equity owner of TVD, Stephen should have received a percentage of the proceeds from the sale of land to CSRC. To fund the development of the surgical recovery center, CSRC asked the City of Bel Aire to issue Industrial Revenue Bonds, which it did in the spring of 2013.[20] Security Bank of Kansas City served as Trustee of the bond issue.[21] Community National Bank purchased the Series A bonds and various individual investors purchased the Series B bonds.[22] The City used their proceeds to fund the development of CSRC. CSRC conveyed the property to the City for lease-back to CSRC.[23] CSRC's rental payments were to retire the bonds.

As part of the bond transaction, CSRC and George R. Watson, D.O. executed unlimited guaranties while other members of CSRC gave limited guaranties of the bond debt and CSRC's lease payments.[24] Still married to Stephen, Terrie asked him to execute a limited guaranty (with her) dated May 6, 2013 in the amount of $613,800

---

[18] Trial Ex. 7.
[19] Trial Ex. J.
[20] Trial Ex. L, 2012 Industrial Revenue Bond Application; Trial Ex. R – May 6, 2013 Trust Indenture for 2013 Industrial Revenue Bonds up to $4,745,000 principal amount of bonds.
[21] Trial Ex. R.
[22] *Id.* at p. 256.
[23] Trial Ex. 8, Warranty Deed, and Trial Ex. S, Lease.
[24] Trial Ex. T.

**6**

("Guaranty").[25] Stephen did so without consulting with his divorce attorney T. Lynn Ward about the Guaranty. Ms. Ward testified that she was unaware of the Guaranty, which explains the absence of any reference to it (or to the quid pro quo the Bank alleges here) in the Settlement Agreement that Stephen and Terrie signed the following year. Nor does it appear that Terrie's divorce attorney communicated with Ms. Ward about the Guaranty.

Stephen initially didn't want to execute the Guaranty on the CSRC project, but testified that he did so for several reasons. First, he was motivated by Terrie's statement that, once she received her loan (the bond issue), she would no longer need spousal support from him. But that was only part of his motivation. Second, he greatly respected Dr. Watson. When Watson told Stephen of his plans to rent the ground floor of the CSRC building for his medical practice, Stephen was convinced that Dr. Watson's presence as the anchor tenant in the development would greatly enhance the marketability of the CSRC project. That made Stephen think that a successful CSRC project would drive significant potential further development of the TVD land, from which he stood to gain.[26] In short, Dr. Watson's involvement in the project gave Stephen "comfort" to sign the Guaranty. Unfortunately, Watson contracted cancer and died shortly thereafter without ever moving his medical practice into the CSRC building. Third, Stephen had solicited over $2 million from physician investors for the development because Terrie couldn't raise the capital

---

[25] *Id.*
[26] Stephen went so far to state that he wanted to be in the CSRC project after he had talked to Dr. Watson.

**7**

without him. Because his reputation in the medical community was at stake, he had a personal business interest in seeing that the TVD development was successful and the CSRC project was the first phase. Fourth, CSRC's success would give Terrie financial independence that would free up Stephen's resources to address his growing tax liabilities.

Stephen and Terrie's July 2014 Settlement Agreement purported to resolve all spousal maintenance and property division claims between them, including those relating to their business interests.[27] Mysteriously, the Agreement contains no mention of Stephen's 2013 Guaranty or the alleged quid pro quo (guaranty for alimony), but it does state:

> Respondent [Terrie] will indemnify and hold Petitioner [Stephen] harmless if he were ever required to pay anything toward any debt (including the Community National Bank loan) for Concierge Surgery and Recovery Center, LLC or its related entities. [28]

The Agreement also specifies that Stephen was to pay Terrie $2,500 monthly spousal maintenance for six months (the remainder of 2014) in addition to the spousal maintenance he had previously paid under the temporary orders entered in the case.[29] Apparently, Stephen never asserted the existence of his Guaranty or the alleged agreement with Terrie at any point in the settlement negotiations nor communicated the same to his counsel. It simply never came up during the settlement negotiations. In the Division of Debts section, Terrie agrees to "assume and pay and

---

[27] Trial Ex. 19.
[28] *Id.* at p.6.
[29] *Id.* at p. 3. Stephen reported paying Terrie over $47,000 of alimony on his 2013 income tax return. *See* Trial Ex. T-103.

8

hold [Stephen] harmless from the payment of . . . any debt associated with [CSRC] or its related entities . . . ."[30] Finally, the Settlement Agreement contains an integration clause stating that it is the complete and full agreement of the parties. That "complete and full agreement" never incorporated or mentioned the guaranty-for-support agreement.[31]

The CSRC project and TVD development failed quickly after Dr. Watson's death, CSRC defaulted on the lease, and Stephen and the other guarantors were left with guaranty liability to Security Bank as trustee of the bond issue. The Bank sued Stephen and the other limited guarantors,[32] obtaining a $613,000 judgment (plus pre- and post-judgment interest) against Stephen on June 23, 2016.[33] Stephen's bankruptcy filing followed soon after.

Analysis and Conclusions of Law

According to the Bank, Grillot should be subjected to § 707(b)(1)'s dismissal for abuse provision.[34] It claims that Stephen's case is either presumptively abusive because it fails the means test[35] or that granting Stephen chapter 7 relief constitutes an abuse based upon the totality of the circumstances of his financial situation.[36] But § 707(b)(1) provides that only chapter 7 cases "filed by an individual debtor . . . whose

---

[30] Trial Ex. 19, p. 11.
[31] *Id.* at p. 15.
[32] Trial Ex. 9.
[33] Trial Ex. 14. *See* Security Bank's Proof of Claim No. 2 showing Journal Entry of Final Judgment filed of record on June 23, 2016 and amount of the judgment on the date of the petition, July 8, 2016 as $644,511.
[34] Doc. 17.
[35] 11 U.S.C. § 707(b)(2).
[36] 11 U.S.C. § 707(b)(3)(B).

**9**

debts are primarily consumer debts" may be subject to dismissal for abuse. Thus, the threshold issue is whether Stephen's debts are primarily consumer debts. If they aren't, § 707(b) doesn't apply, ending the inquiry. If more than half of a debtor's total debt is "consumer debt," the "primarily consumer debts" standard in § 707(b)(1) is met and the means test or totality analysis may proceed.[37] The Bank bears the burden of proving that Stephen's case involves primarily consumer debts.[38]

Whether Stephen's $642,117 Guaranty is a "consumer debt" determines whether his total debts are "primarily consumer debts" and § 707(b)(1) is applicable. The Guaranty is Stephen's largest debt, constituting 49% of his $1,305,495 total indebtedness. If the Guaranty is a consumer debt the total of it and his $175,000 home mortgage debt will exceed 50% of the total debt. Stephen's $445,911 tax debt is his second-largest obligation and, as a matter of law, income tax debt is a non-consumer debt.[39] Therefore if the Guaranty is found to be a non-consumer debt, more

---

[37] *See In re Stewart,* 175 F.3d 796, 808 (10th Cir. 1999) (pre-BAPCPA case); *In re Kelly,* 841 F.2d 908, 913 (9th Cir. 1988); *In re Hardigan,* 490 B.R. 437, 455 n. 17 (Bankr. S.D. Ga. 2013) (BAPCPA case).

[38] *See In re Reed,* No. 16-18947, 2017 WL 1491763 *3 (Bankr. D. Colo. Apr. 25, 2017); *In re Reavis,* No. 06-11721, 2007 WL 2219519 at *5 (Bankr. N.D. Okla. July 30, 2007).

[39] The courts conclude that because tax debt is not "incurred," but is involuntarily imposed by the government in the course of earning income and has a public purpose, income tax obligations are not consumer debts. *See e.g., In re Brashers,* 216 B.R. 59, 60-61 and n. 1 (Bankr. N.D. Okla. 1998) (citing numerous cases); *In re Jelinger,* No. 12-30949, 2014 WL 996266 at *4 (Bankr. N.D. Ohio Mar. 13, 2014); *In re Burton,* No. 12-00676, 2013 WL 8351980 at *3-4 (Bankr. S.D. Iowa Mar. 18, 2013); *In re Kintzele,* No. 12-04916-8, 2013 WL 218856 at *1 (Bankr. E.D. N.C. Jan. 18, 2013). *See also I.R.S. v. Westberry (In re Westberry),* 215 F.3d 589 (6th Cir. 2000) (for purposes of 11 U.S.C. § 1301, tax debt is not consumer debt).

**10**

than half of Stephen's debts will be non-consumer debts.[40]

The Code defines a "consumer debt" as one incurred "primarily for a personal, family, or household purpose."[41] The Court must apply this definition to the factual circumstances of this case. The Bank alleges that Stephen and Terrie entered into a "quid pro quo" whereby Terrie would waive any further support in their divorce proceeding in exchange for Stephen's Guaranty of the CSRC debt and that trading the Guaranty for the support release makes it a consumer debt as a support obligation would be. But Stephen cited multiple reasons for signing the Guaranty, pointing our inquiry toward determining his "primary" purpose for doing so.[42]

An individual's guaranty of a business or commercial debt is generally a non-consumer debt.[43] A support obligation is generally a consumer debt.[44] Neither of these straightforward legal principles can be neatly applied to the facts of this case. Stephen did not guarantee the debt for a business he owned or controlled, he had no financial interest in CSRC, and he received no proceeds of the bond issue. The Bank says that shows that Stephen had no "profit motive" for giving the CSRC Guaranty and, accordingly, it cannot be a non-consumer debt under controlling authority in the

---

[40] The tax debt and guaranty combined would amount to $1,087,911, or 83% of the total $1.3 million debt.
[41] 11 U.S.C. § 101(8).
[42] *Supra,* at pp. 7-8.
[43] *See In re Straughter,* 219 B.R. 672 (Bankr. E.D. Pa. 1998) (wife's guaranty was for purpose of providing funds for her debtor husband's business and debt was not used in any consumer capacity); *In re SFW, Inc.,* 83 B.R. 27 (Bankr. S.D. Cal. 1988) (shareholders' guarantees of commercial loans were not consumer debts); *In re Jelinger,* Adv. No. 12-3156, 2014 WL 996266 at *4 (Bankr. N.D. Ohio Mar. 13, 2014) (guarantees on corporate debt are not consumer debts).
[44] *In re Stewart,* 175 F.3d 796 (10th Cir. 1999).

**11**

Tenth Circuit, *In re Stewart*.[45] *Stewart* was a pre-BAPCPA case where the debtor (also a doctor) borrowed $200,000 from his former in-laws while married to their daughter and incurred "student loan" debt of $218,000, of which $100,000 was used to pay his support obligations after he and his wife divorced. When the United States Trustee filed a motion to dismiss under former § 707(b) for substantial abuse, the debtor unsuccessfully attempted to recharacterize his debts as non-consumer debts. The debtor appealed from the bankruptcy court's conclusion that his debts were "primarily consumer debts." He argued that the intra-family loans and student loans were non-consumer debt incurred to complete his medical degree and a higher level of education. The Tenth Circuit looked to the purpose of the intra-family loans and distinguished consumer debt from non-consumer debt, the latter being debt incurred with a "profit motive."[46] The evidentiary record in *Stewart* demonstrated that debtor used the loan proceeds "predominantly for family living expenses rather than for direct educational costs."[47] Stewart used the money to support his family -- for house payments, groceries, pre-school, children's activities, and vacations. As to the student loans, those too were held to be consumer debt because a substantial portion of the money was used to pay support obligations, rather than direct educational costs. Lastly, the court held that Stewart's $250,000 alimony debt to his ex-wife was a consumer debt because it was for her support and benefit and not incurred with a profit motive.

---

[45] 175 F.3d 796 (10th Cir. 1999).
[46] *Id.* at 806, citing *Citizens Nat'l Bank v. Burns (In re Burns)*, 894 F.2d 361, 363 (10th Cir. 1990).
[47] *Id.* at 806-07.

**12**

*Stewart* is factually distinct from this case. First, Dr. Grillot received none of the IRB proceeds and spent none of them on family or spousal support. Second, his motives in making the Guaranty were mixed at best. He perceived a possible business opportunity, especially after Dr. Watson signed on as anchor tenant. He had a reputational interest in the project's success because he had solicited fellow physicians to invest. While it is true that he expected not to have to support Terrie once her business got started, that is not the same as "trading" the Guaranty for her releasing him from any alimony obligation. Indeed, under the couple's eventual Settlement Agreement, Grillot still had to pay Terrie through the close of 2014, long after he signed the Guaranty. Ms. Ward testified she knew nothing of this alleged "agreement" as did the Bank's representative. Terrie did not testify at all. The Bank did not prove the existence of an agreement to substitute a Guaranty for alimony; if it had, it is possible that a court could find that the Guaranty was made in lieu of alimony which is commonly understood to be "consumer" in nature.[48] But this record does not support that conclusion.

Stephen's Guaranty arguably meets the profit motive standard. He lent his name to the CSRC project and Guaranty after Dr. Watson revealed his intent to be the anchor tenant. Stephen expected Dr. Watson's participation in the project to

---

[48] *Cf. In re Palmer,* 117 B.R. 443 (Bankr. N.D. Iowa 1990) where under a divorce decree the debtor's former wife was awarded a $24,000 lump sum cash payment in exchange for debtor's retention of the marital home and pension. Under those circumstances, the bankruptcy court concluded debtor's lump sum obligation was a consumer debt: "Given the nature of the marital property awarded to the Debtor, the lump sum award is in the nature of a debt incurred to finance the retention of a home." *Id.* at 447. Because the debt was incurred principally to allow debtor to retain the home it was a consumer debt.

**13**

enhance the success of the CSRC project, and in turn, stood to gain financially as an interest owner in TVD from the sale(s) of surrounding acreage for further development. The CSRC project was the first stage of the TVD development. Another financial motive for Stephen to guarantee the CSRC bond was his belief that, if the CSRC project opened for business, Terrie would become financially independent of him, freeing up the resources he was presently expending on her for payment on his tax debt – a non-consumer debt. This is more like the debtor's situation in *In re Burton,* which the bankruptcy court assessed as follows in rejecting the United States Trustee's contention that debtors' tax debt should be classified as consumer debt for purposes of § 707(b)(3):

> Here the Debtors believed that [their former] business [debt] losses could be used to offset personal income tax obligations, which would result in them retaining more of their earnings. Such planning, even if it was mistaken or unsuccessful, bears more of a relationship to an eventual profit motive, than a consumer transaction.[49]

I conclude that the Guaranty debt in this case is more like non-consumer debt than a consumer debt; the Guaranty debt was incurred primarily on behalf of a business venture and commercial transaction.[50]

Other courts have found certain debts to be non-consumer debts without demonstrating a profit motive for incurring the debt. One such debt is income tax debt.[51] Other debts such as tort liability for a car accident, personal injury, product

---

[49] No. 12-00676-als7, 2013 WL 8351980 at *3 (Bankr. S.D. Iowa Mar. 18, 2013).
[50] *See In re Runski,* 102 F.3d 744, 747 (4th Cir. 1996) ("[C]ourts have concluded uniformly that debt incurred for a business venture or with a profit motive does not fall into the category of debt incurred for "personal, family, or household purposes.").
[51] *See* note 39, *supra.*

**14**

liability, or wrongful death are not incurred with a profit motive, yet are non-consumer debts.[52] While the presence of a "profit motive" may be a distinguishing factor as the *Stewart* court found, nothing in *Stewart* or § 101(8) makes it the only factor.[53]

Regarding the alleged quid pro quo agreement between Stephen and Terrie, there is no evidence that such an agreement existed. Signing the Guaranty was "part" of Stephen's promise to support her on the CSRC project.[54] Terrie needed Stephen's name to get the investors and in seeking his guaranty admitted the CSRC project, "won't fly unless you help me do this."[55] If she got the business up to speed, she would not need Stephen's ongoing support. That is different from giving the Guaranty solely in exchange for Terrie's promise not to prospectively seek alimony from him. The bankruptcy court should determine debtor's initial purpose or intent in incurring the debt by evaluating the facts at the time the debt was incurred to avoid the impact of a debtor's recharacterizing the transaction, as the debtor did in *Stewart*.[56] But, nothing in the record supports the existence of such an agreement; indeed, pieces of evidence point to a contrary conclusion. The record reflects that Grillot incurred a

---

[52] *See In re Stovall,* 209 B.R. 849 (Bankr. E.D. Va. 1997); *In re Marshalek,* 158 B.R. 704 (Bankr. N.D. Ohio 1993); *In re White,* 49 B.R. 869 (Bankr. W.D. N.C. 1985).
[53] *See In re Peterson,* 524 B.R. 808, 813 (Bankr. S.D. Ind. 2015) (inability to classify a particular debt as a business debt does not automatically relegate it to the status of a consumer debt); *In re Brashers,* 216 B.R. 59, 61 n.2 (Bankr. N.D. Okla. 1998) (while "debts incurred with a "profit motive" are **clearly** non-consumer, the reverse is not true."); *In re Millikan,* No. 07-01759-AJM-7, 2007 WL 6260855 at *5 (Bankr. S.D. Ind. Sept. 7, 2007) (describing the profit motive test "unworkable" in some situations).
[54] *See* Trial Ex. 21, Bank's designation of Grillot's 2004 examination, p. 19, l. 9-22.
[55] *Id.* at p. 21, l. 14-20.
[56] *See Palmer v. Laying,* 559 B.R. 746, 753 (D. Colo. 2016).

**15**

guaranty obligation he could ill-afford and did so while ***continuing*** to pay Terrie support with funds that should have gone to paying his current tax obligations and reducing his substantial back tax debt. Terrie, the other party with personal knowledge of the circumstances surrounding the execution of the Guaranty, was not called to testify at trial. Neither Stephen's divorce attorney nor the Bank's witness, had any knowledge of any "agreement" and the Court was left with assessing Stephen's credibility only.

Recently, the Ninth Circuit Court of Appeals applied the "primarily consumer debt" provision of § 707(b) in a split decision, *In re Cherrett.*[57] There the chapter 7 debtor's former employer offered him a home loan as an inducement to move from Wyoming, where he lived and worked, to Colorado where the employer offered debtor a managerial position. When the employee resigned his job and filed for chapter 7 relief, the employer moved to dismiss for abuse under § 707(b), contending that its housing loan was a consumer debt. The Ninth Circuit affirmed the bankruptcy court's order denying the motion to dismiss, holding that it did not commit clear error in finding that the housing loan was a non-consumer debt. *Cherrett* is significant because it holds that the determination whether a debt was incurred primarily for a person, family or household purpose under § 707(b)(1) is a factual inquiry that is reviewed under the more deferential clearly erroneous standard, not a legal determination subject to *de novo* appellate review. Cherrett took a loan from his new employer to purchase a small condominium in Aspen, Colorado. When he moved

---

[57] *Aspen Skiing Co. v. Cherrett (In re Cherrett),* 873 F.3d 1060 (9th Cir. 2017).

there to work, he left his family in Wyoming at the family home. He viewed his relocation as temporary and expected to return when his new employer expanded into Wyoming. When none of that came to pass, Cherrett resigned from his job and in 2013, he and his wife filed a chapter 7 petition. In determining the housing loan was incurred primarily for a business purpose, the bankruptcy court found that Cherret purchased the Colorado condominium to make more money, work at a top of the line Aspen resort, and further his career. He would not have accepted the Colorado offer without the housing loan. The Ninth Circuit rejected the employer's argument that debts used to purchase homes are consumer debts as a matter of law.[58] Citing *Stewart,* the Ninth Circuit stated:

> Evidence that a debtor incurred a debt "purely or primarily as a business investment, albeit an investment in herself or himself, much like a loan incurred for a new business," can serve as an important factor in determining the debtor's purpose.[59]

Consistent with the Ninth Circuit's view, I have endeavored to determine Stephen's primary purpose from the evidence before me:

> [I]t is appropriate to consider all the circumstances indicative of the debtor's primary purpose. *Westberry*, 215 F.3d at 593 ("[W]hile the profit motive analysis may assist in the determination of which debts are not consumer debt, it does not prohibit other debts from falling outside of the category of consumer debt."); *Kestell v. Kestell (In re Kestell)*, 99 F.3d 146, 149 (4th Cir. 1996) (determining that a debt owed pursuant to a divorce judgment was consumer debt because it was not incurred "with a profit motive *or in connection with a business transaction*" (emphasis added)).[60]

---

[58] *Id.* at 1066-67.
[59] *Id.* at 1067.
[60] *Id.* at 1068.

17

The result in *Cherrett* supports my conclusion here that Stephen's Guaranty of Terrie's CSRC project and the bond transaction is not a consumer debt.

Conclusion

Because the Bank has not persuaded me that Stephen primarily incurred the guaranty debt for a personal, family or household purpose, I conclude that the Guaranty is predominantly a business debt that should not be counted as a consumer debt in the "primarily consumer debt" calculation. Stephen Grillot lent his name to the Guaranty for the first phase CSRC business venture to potentially profit from CSRC's success and further development of the TVD land and once the CSRC project was up and going, to address his non-consumer tax debt. With this conclusion, Stephen's debts in his chapter 7 case are primarily non-consumer debts and § 707(b) is not applicable. The Bank's motion to dismiss for abuse is DENIED.

# # #